UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

PETER P. PERRY and
MICHAEL T. BORDICK,

         Plaintiffs

v.

JOHN H. WOLAVER and
BARBARA J. WOLAVER,

         Defendants

Civil No. 05-161-P-C

Gene Carter, Senior District Judge

**ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Now before the Court are the parties' cross Motions for Partial Summary Judgment. The dispute in this case concerns Plaintiffs' sale of two Maine LLC's to Defendants. The Amended Complaint (Docket Item No. 22) sets forth claims alleging that Defendants have breached three contracts relating to that sale, specifically, a Promissory Note (Count I), an oral agreement (Count II), and a Pledge and Security Agreement (Count III). The Amended Complaint also seeks reformation of a Purchase and Sale agreement to conform with actions underlying the oral agreement (Count IV).

Defendants' Counterclaim (Docket Item No. 24) seeks a declaratory judgment that the purchase price of the companies was overstated by $134,617.59 plus interest (Count I), rescission of the oral agreement (Count II), reformation of the Promissory Note

(Count III), and a declaratory judgment that Defendants are not in breach or default of the Promissory Note (Count IV).[1]

Plaintiffs have moved for summary judgment on Count I of the Amended Complaint and Counts III and IV of the Counterclaim.[2] (Docket Item No. 29) Defendants seek summary judgment on all Counts of the Amended Complaint and Counts II and IV of their Counterclaim. (Docket Item No. 27) Defendants also request partial summary judgment on Counts I and III of the Counterclaim.

For the reasons stated below, the Court will grant Defendants summary judgment on Counts I, III, and IV the Amended Complaint and Count I of the Counterclaim insofar as it seeks a declaratory judgment that Defendants are entitled to $48,276 under the purchase price adjustment provision of their Purchase and Sale agreement. The Court will also grant Plaintiffs summary judgment on Count III of the Counterclaim insofar as Defendants seek reformation of the Note to set-off the $48,276 referenced above. The parties' remaining requests for summary judgment will be denied.

## I. Facts

With few exceptions, the facts are undisputed. In 2003, Peter P. Perry and Michael T. Bordick (hereinafter "Plaintiffs") began actively seeking buyers for two companies that they owned, Perry Transport LLC and Perry Transport Logistics Services

---

[1] Defendants' motion also seeks a finding that they are contractually entitled to an award of attorneys' fees; however, there appears to be no claim for attorneys' fees in the Counterclaim. Regardless of whether this claim is properly before the Court, an issue not raised by Plaintiffs, because issues affecting any award of attorneys' fees remain for trial, the Court hereby **DENIES** the request for summary judgment at this time.

[2] Plaintiffs' Motion for Summary Judgment does not seek judgment on any claims relating to the oral agreement. In response to Defendants' Motion for Partial Summary Judgment, however, Plaintiffs request judgment in their favor on the various claims relating to this agreement. Because Plaintiffs' Motion for Summary Judgment did not seek judgment on these claims, and the request made in Response to Defendants' Motion for Summary Judgment occurred after the filing deadline for dispositive motions, the Court will not consider Plaintiffs' request for judgment on these claims.

LLC (hereinafter "the companies"). Defendants' Statement of Undisputed Material Facts ¶ 1 (Docket Item No. 28) (hereinafter "DSUMF"). Plaintiffs entered into negotiations with John H. Wolaver and Barbara J. Wolaver (hereinafter "Defendants") in late 2003. *Id*. ¶ 5. On January 27, 2004, the parties signed a letter of intent relating to Defendants' purchase of the companies. *Id*. ¶ 6; Letter from John Wolaver to Peter P. Perry (hereinafter "letter of intent"), *attached* as exhibit 1 to Affidavit of David C. Johnson (Docket Item No. 31).

Although the letter of intent provided that it was "not a legally binding instrument," it contained, with only a few exceptions, the substantive terms and conditions of Defendants' subsequent purchase of Plaintiffs' companies. The letter of intent provided that the total price to be paid for the purchase of both companies would be $715,000. Letter of intent at 1. It also provided for a "Purchase Price Adjustment," stating that the purchase price would be adjusted by the change in the "dollar amount of the combined members' capital[3] of the Companies" between December 31, 2003 and the closing. *Id*. at 1-2. The letter of intent also stated that the dollar amount of members' capital on December 31, 2003 was $366,956 and that closing was to occur on or before February 29, 2004. *Id*. at 1.

An additional term contained in the letter of intent, not found in the parties subsequent written agreements, provided for the divestment of certain assets and liabilities. Pertinent to this dispute, it provided that, on or before the closing date, the companies would divest the cash on hand and cash equivalents. *Id*. Although this provision was not contained in any of the subsequent written agreements, the parties

---

[3] Although the term "members' capital" is not defined in any of the written agreements, the Court has deduced from the record that the parties intended for it to be determined by subtracting the total liabilities of the companies from the total assets of the companies.

3

agree that they both intended that cash and cash equivalents would be divested from the companies prior to the closing. Plaintiffs' Opposition Statement of Facts ¶ 111 (Docket Item No. 36). The record further establishes that, sometime between February 27 and February 29, 2004, cash and cash equivalents in the amount of $119,371 were divested from the companies and retained by Plaintiffs. *Id*. ¶ 109.

On February 27, 2004, the parties executed the written agreements currently in dispute. These documents include (1) a Purchase and Sale Agreement (hereinafter "P&S"), (2) a Promissory Note from Defendants to Plaintiffs in the amount of $315,000 (hereinafter "Note"), and (3) a Pledge and Security Agreement (hereinafter "Pledge Agreement"). On the same day, in addition to executing these documents, Defendants paid Plaintiffs $400,000 and Plaintiffs conveyed to Defendants their membership interests in the companies.

Similar to the letter of intent, the P&S provided that the parties would adjust the purchase price within thirty days of the closing and described how the adjustment would be calculated. It states:

> The Purchase Price shall be adjusted (i) upward by the excess, if any, of the total value of the assets net of liabilities on the books of Transport and Logistics as of the Closing Date (the "Net Assets") exceeds…$366,956 (the "Baseline Amount"), or (ii) downward by the excess, if any, of the Baseline Amount over the Net Assets (the "Purchase Price Adjustment").

P&S ¶ 4, *attached* as exhibit 2 to Affidavit of David C. Johnson. Subsequent to the execution of the P&S the parties agreed to have Plaintiffs' broker calculate the purchase price adjustment. The broker eventually provided Plaintiffs and Defendants with his calculations and his conclusion that Defendants were obligated to pay Plaintiffs an additional $41,151. DSUMF ¶ 16. Based upon the

4

broker's conclusion, the parties negotiated a plan for payment, and Defendants agreed to pay the amount in nine installments. *Id*. ¶ 32.

Although not noticed by anyone at the time, the parties now agree that the purchase price adjustment was not calculated in accordance with the P&S. *Id*. ¶ 25. Indeed, the parties agree that the broker did not even see the P&S until months after the calculation was performed. *Id*. ¶ 30. From the record, the broker's calculation appears to deviate from the P&S in two ways. First, rather than using the baseline amount provided in the P&S, the Broker performed his own calculation to determine the dollar amount of members' capital as of December 31, 2003 and used this new calculation as the baseline amount. *See* Broker's Calculation of Purchase Price Adjustment, *attached* as exhibit 8-B to Affidavit of David C. Johnson. The parties agree that this was not in accordance with the P&S. Defendants assert, and Plaintiffs do not contest,[4] that, had the broker used the baseline amount, he would have concluded that Defendants were entitled to a reduction in the purchase price of $48,276.[5]

The second apparent deviation committed by the broker is less obvious, but ultimately more significant. The broker determined that on December 31, 2003, "total equity," a number derived by the same method as members' capital—subtracting the companies' total liabilities from their total assets, was $366,320. *Id*. at 2. However, prior to comparing this amount to members' capital on the date of closing, the broker excluded all cash and cash equivalents held on December 31, 2004, an amount totaling $88,297.

---

[4] Plaintiffs do argue, however, that this calculation would have been erroneous for other reasons. The Court will address these issues later in this Order.

[5] The Court notes that there is a slight discrepancy between the balance sheet used by the broker (Exhibit 8-B at 1-2) and his written calculations (Exhibit 8-B at 3) resulting in a difference of $494. Because the parties do not raise this issue, and both rely upon the balance sheet in making their own calculations, the Court will accept that the balance sheet accurately reflects the assets and liabilities of the companies on the respective dates.

5

*Id*. at 3. Using this form of calculation, the broker determined that Plaintiffs were entitled to an increase in the purchase price of $41,151.[6] *Id*. at 3.

In early 2005, the new general manager of the companies indicated to Defendants that the purchase price adjustment had not been properly calculated. Based upon Defendants' review of the broker's calculations they believed they should have received a reduction in the purchase price of $48,276 instead of the increase of $41,151 calculated by the broker. Defendants informed Plaintiffs of this belief and stopped making the installment payments for the purchase price adjustment.

While the parties discussed Defendants' claims regarding the purchase price adjustment, another dispute arose regarding payments due under the Note. The Note obligated Defendants to make monthly payments, due on the first of each month, of $6,163.36. Promissory Note at 1, *attached* as exhibit 3 to Affidavit of David C. Johnson (hereinafter "Note"). The Note provided a 15 day "grace period" within which Defendants could tender payments without penalty. *Id*. In April and May of 2005, Defendants failed to tender their monthly payments within the grace period. Defendants did eventually tender their monthly payments in April and May, and Plaintiffs accepted both tenders. DSUMF ¶ 38.

In June of 2005, Defendants again failed to tender their payment due under the Note. On June 27, 2005, Plaintiffs served a written notice of default on Defendants. *See* letter dated June 27, 2005, *attached* as exhibit 10-A to Affidavit of David C. Johnson. The notice stated that the Note was in default and that the default under the Note also constituted a default under the Pledge Agreement. *Id*. The notice purported to trigger a 15 day "cure" period provided in the Pledge agreement. *Id*. On June 30, 2005, Plaintiffs'

---

[6] Based upon the balance sheet this amount would have been $494 less, or $40,657.

attorney agreed to grant Defendants a ten-day extension of the cure period. *See* letter dated June 30, 2005, *attached* as exhibit 10-B to Affidavit of Daviod C. Johnson.

On July 21, 2005, Defendants tendered to Plaintiffs two checks, each in the amount of $6,163.36. DSUMF ¶ 41. The checks were offered in payment of the past due payments for June and July. *Id*. Although Plaintiffs concede that the checks were tendered within the extended cure period, Plaintiffs did not deposit or cash them. *Id*. ¶ 42. On July 26, 2005, Plaintiffs provided Defendants written notice that they were accelerating the Note and demanded payment in the amount of $256,680.42. *See* letter dated July 26, 2005, attached as exhibit 10-C to Affidavit of David C. Johnson. Defendants tendered no further payments.

## II. Standard of Review

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). "A trialworthy issue exists if the evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is 'sufficiently open-ended to permit a rational

factfinder to resolve the issue in favor of either side.'" *De-Jesus-Adorno v. Browning Ferris Indus.*, 160 F.3d 839, 841-42 (1st Cir. 1998) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995)).

### III. Discussion

#### A. Breach of the Note (Count I of the Amended Complaint and Count IV of the Counterclaim)

Both parties seek summary judgment on their claims regarding breach of the Note. Resolution of these claims depends, primarily, upon whether or not Plaintiffs properly accelerated the Note. Although the Note states that acceleration could occur without notice or demand, it does not state that acceleration would occur automatically upon default. Rather, the Note states that acceleration would occur "at the election of the holders." Note at 2. Plaintiffs have not argued, and the record does not support the contention, that Plaintiffs exercised this right of election prior to the written notice sent to Defendants on July 26, 2005. Consequently, acceleration of the Note was proper only if Plaintiffs had the right to do so on that day.

The Note provides Plaintiffs the right to elect to accelerate "during the continuance of any…default." Note at 2. A default is defined as, *inter alia*, Defendants' failure to tender the monthly payments within the 15 day grace period. *Id*. at 1-2. Accordingly, the right to elect acceleration of the Note undoubtedly arose after Defendants failed to make monthly payments within the "grace period."

The more difficult question, not answered by the Note, is what would make a default cease to continue, and, consequently, terminate Plaintiffs' right to accelerate. Resolution of this issue requires consideration of the Pledge Agreement executed by the parties along with the Note. The Pledge Agreement grants Plaintiffs a security interest in

all the membership units of the companies. Pledge and Security Agreement at 1 (hereinafter "Pledge Agreement"), *attached* as exhibit 4 to affidavit of David C. Johnson. This security interest secures the Note. *Id*. A default under the Note constitutes a default under the Pledge Agreement. *Id*. at 2. The parties agree that the Pledge Agreement provided a 15 day "cure" period. *See id*. at 1. The parties disagree with respect to what extent, if any, the cure period in the Pledge Agreement applies to the Note. Plaintiffs argue that this cure period did not apply to the Note, but only to the Pledge Agreement. Defendants argue that because the two agreements are so interrelated, the only logical interpretation of the agreements is that the cure period also applied to the Note.

While the parties frame the issue in terms of a right to "cure", the Court notes that, for present purposes, the question is a narrower one. What proves dispositive of this dispute is that the cure period contained in the Pledge Agreement permitted Defendants to terminate the default under the Note by tendering all past due amounts. Because a default under the Note constitutes a Default under the Pledge Agreement, so long as the Note remains in default, the Pledge Agreement is also in default. *Id*. at 1-2. To cure the default under the Pledge Agreement, Defendants must be entitled to terminate the default under the Note. *See id*. If the Pledge Agreement gives Defendants 15 days to cure a default that is incurable, then the grace period provided by the Pledge Agreement is an illusory right. The only logical construction of these agreements is that within the cure period provided by the Pledge Agreement, Defendants could tender payment for the amounts then due under the Note, and that such tender would terminate Defendants' default under the Note.

The parties agree that Defendants tendered all of the monthly payments then due under the Note within the cure period provided by the Pledge Agreement.[7] Tender of these payments terminated their default under the Note. The default having terminated, Plaintiffs did not have the right to elect to accelerate the Note on July 26, 2005.

Plaintiffs, however, raise another basis for default of the Note. They point to provisions in the Note that impose late fees and an increased rate of interest after default. Plaintiffs argue that because Defendants' late tender failed to include these late fees and increased interest payments, Defendants remained in default on July 26, 2005. However, an essential predicate of this argument, that Defendants were required to include such payments with their monthly payments, is entirely lacking from Plaintiffs' briefs. Plaintiffs point to nothing in the Note or the associated agreements which provide that late fees and increased interest are to be paid with the monthly payments. Having provided no argumentation supporting such a construction of the Note, this argument is not sufficient to survive Defendants' Motion for Summary Judgment.

Finally, Plaintiffs allege that Defendants' failure to tender the monthly payment due August 1, 2005, is an additional basis for default. However, Defendants' tender for June and July having been wrongfully rejected, Defendants were under no obligation to attempt to tender further payments. *See Duffy v. Patten* (Me. 1883) ("It is not necessary to tender to a party what he in advance announces that he will not receive.").

Accordingly, no genuine issue of material fact exists with respect to the validity of Plaintiffs' claim under the Note and Defendants are entitled, as a matter of law, to

---

[7] Plaintiffs have offered some evidence that these checks contained an unauthorized signature. However, Plaintiffs have not asserted that any such irregularity would have affected the negotiability of the checks, and provide no argument based upon this asserted fact.

summary judgment on Count I of the Amended Complaint and Count IV of their Counterclaim.

### B. Purchase Price Adjustment (Count II and IV of the Amended Complaint and Counts I and II of the Counterclaim)

Although the parties agree that the purchase price adjustment was not calculated in conformance with the P&S, they disagree with respect to the effect of the deviation. Defendants contend that, had the broker used the baseline amount contained in the P&S, he would have determined that Defendants were entitled to an adjustment in the amount of $48,276.

Plaintiffs respond, however, that Defendants' proposed calculation would still not reflect a calculation in conformance with the P&S because of another inconsistency. Specifically, Plaintiffs argue that strict conformance with the P&S required the broker to compare the baseline amount with the companies' net assets on the day of closing. On February 27, 2004, the day Plaintiffs contend was the day of closing, the companies apparently held $119,371 in cash and cash equivalents. The broker, however, made his calculations based upon the companies' net assets on February 29, 2004, after all of the cash and cash equivalents had been divested. Plaintiffs assert that the P&S required the broker to include this $119,371 in his calculation of net assets. Had the broker done so, rather than finding a decrease of $48,276, he would have found an increase in the companies' net assets of $71,096. Thus, Plaintiffs argue, a calculation of the purchase price adjustment in strict conformance with the P&S would actually have benefited Plaintiffs, as they would have been entitled to an even greater increase in the purchase price than originally calculated.

Since both parties agree that the P&S required use of the baseline amount, the only dispute is as to the proper "closing" date for purposes of determining the purchase price adjustment. The P&S defines the closing as follows:

> Closing. The consummation of the transaction referred to in this Agreement (the "Closing") shall take place on February 27, 2004 or on such other date as may be mutually agreed upon by the parties (the "Closing Date").

P&S ¶ 1. Plaintiffs assert that there was never any agreement to extend the closing date beyond February 27, 2004, and that, in fact, all of the events required to occur at the closing, such as transfer of the membership interests in the companies and the related payments, all occurred on February 27, 2004. Plaintiffs overlook, however, that the parties agreed to the divestment of cash and cash equivalents prior to closing. Consequently, the closing, defined as the consummation of the parties' transaction, could not occur until the cash was divested. Based upon the undisputed agreement of the parties, a proper calculation of the purchase price adjustment must reflect the net assets of the companies <u>after</u> the divestment. A proper calculation of the purchase price adjustment, in conformance with the P&S, would have entitled Defendants to $48,276.[8] Accordingly, Defendants are entitled to summary judgment on Count I of the Counterclaim insofar as it seeks a declaration that they are owed $48,276 by Plaintiffs.

Plaintiffs offer one final argument in order to avoid their obligation under the P&S. Count IV of the Amended Complaint seeks reformation of the P&S based upon an alleged mutual mistake of the parties. Specifically, Plaintiffs claim that despite the terms of the P&S, the parties intended for the purchase price adjustment to be calculated in the

---

[8] Although the Plaintiffs have argued that Defendants "accepted, acquiesced in, and partially performed on" the oral agreement, they have only argued that such conduct forecloses Defendants' right to the equitable remedy of rescission. Aside from their claim for reformation, Plaintiffs have not argued that this conduct renders the P&S unenforceable.

12

manner followed by the broker.  In order to determine the change in members' equity between December 31, 2003 and the closing date, Plaintiffs maintain, the parties intended that the cash and cash equivalents held on December 31, 2003 would be disregarded.  As support for this, Plaintiffs argue that, because cash and cash equivalents would be divested before closing, disregarding the cash and cash equivalents on hand in December would provide an "apples for apples" comparison.  Defendants counter that any mistake was unilateral, and that they were not mistaken with respect to the terms of the P&S.

      The record is devoid of any evidence supporting Plaintiffs claim that there was a mutual mistake regarding the term of the P&S.  Although Plaintiffs make much of the fact that the parties agreed that as of the date the closing was to occur, cash and cash equivalents were to be divested, there is no evidence that the parties also intended for the cash and cash equivalents <u>held as of</u> December 31, 2003, to be disregarded in that analysis.  Plaintiffs' argument that the inclusion of the baseline amount in the P&S was a mutual mistake is directly refuted by the fact that the same baseline amount was included in the parties' letter of intent.  *See* letter of intent at 1.  Accordingly, no trialworthy issue exists with respect to this claim and Defendants are entitled, as a matter of law, to summary judgment on Count IV of the Amended Complaint.

      Although the record validates Defendants' construction of the P&S, Defendants have failed to demonstrate any right to the relief that they seek with regard to the subsequent oral agreement.  Defendants assert that "the Oral Agreement is simply null and void because it is inconsistent with the Purchase Agreement and based entirely on a mutual error of the parties."  Defendants' Motion for Partial Summary Judgment at 19.  Aside from this conclusory assertion Defendants have provided no argumentation

13

supporting this contention. In similar fashion, Defendants provide only a footnote asserting, apparently as an alternative theory, that the oral agreement is unenforceable for lack of consideration. *Id*. While it may be of little import to Defendants under what legal theory they prevail, they must, at the very least, offer those arguments and theories which they believe entitle them to relief. More importantly, Defendants must make such arguments in a manner that permits Plaintiffs an opportunity to properly respond. Defendants have failed to do so here.

Accordingly, the Court will deny Defendants' Motion for Summary Judgment on Count II of the Amended Complaint, and Counts I and II of the Counterclaim insofar as they seek judgment concerning the enforceability of the oral agreement and the right to monies already paid thereunder.

### C. Reformation of the Note (Count III of the Counterclaim)

Both parties seek summary judgment on Defendants' claim for a declaratory judgment reforming the Note to set-off the $48,276 owed to them by Plaintiffs under the purchase price adjustment.[9] Defendants base their right to set-off on both the P&S and Maine common law. Plaintiffs dispute that any such right exists under either theory.

The P&S provides Defendants a right to set-off certain "losses, liabilities or expenses," incurred by Defendants against amounts due under the Note. P&S at 3. While some of Defendants' claims against Plaintiffs may constitute "losses, liabilities or expenses," their right to the amount owed under the purchase price adjustment is part of their bargained for exchange, not an unintended cost arising out of it. Accordingly,

---

[9] Although both parties also seek summary judgment regarding the Defendants' claim for set-off of the other amounts in dispute, the Court believes it would be premature to rule upon Defendants' asserted right to remedy before determining that there is a valid claim underlying it. Accordingly, those requests for summary judgment will be denied.

14

Defendants do not have a contractual right to set-off based upon their claim under the P&S.

Defendants' claim of a common law right to set-off is equally unavailing. Even if Maine law provides the Court with authority to grant such equitable relief, it is undoubtedly discretionary, and the circumstances of this case are not appropriate for its use. When the parties executed these agreements on February 27, 2004, it was foreseeable that Defendants were entitled to a reduction in the purchase price. Despite this, the parties did not provide, in their bargained for agreements, that a reduction in the purchase price would result in Defendants having the right to set-off against their indebtedness under the Note. Had the parties intended for the purchase price adjustment to decrease Defendants' obligations under the Note they could have so provided, as they did for some "losses, liabilities or expense." If Defendants wanted the right to set-off a reduction in the purchase price against the Note, they could have bargained for it with Plaintiffs. The Court will not provide an equitable remedy to give Defendants a benefit to which they are not entitled under the terms of their own bargain.

### D.     Pledge Agreement (Count III of the Amended Complaint)

Defendants also move for summary judgment on Count III of the Amended Complaint which alleges breach under the Pledge Agreement. Although the Amended Complaint alleges several bases for default of the Pledge Agreement, in opposing summary judgment, Plaintiffs have only asserted such a breach based upon the alleged breach of the Note. Because the Court has already determined that the Note is not in default, Defendants are entitled to summary judgment on this claim.

15

## IV. Conclusion

For the reasons set forth above the Court **ORDERS** as follows:

(1) Plaintiffs' Motion for Partial Summary Judgment be, and it is hereby, **GRANTED IN PART** as to Count III of the Counterclaim insofar as Defendants seek reformation of the Note to set-off the $48,276 owed under the purchase price adjustment, and **DENIED** as to Count I of the Amended Complaint and Count IV of the Counterclaim, and **DENIED IN PART** as to Count III of the Counterclaim insofar as Defendants seek reformation of the Note to reduce the amount owed thereunder by $86,341.59 plus interest.

(2) Defendants' Motion for Partial Summary Judgment be, and it is hereby, **GRANTED** as to Counts I, III, and IV of the Amended Complaint and Count IV of the Counterclaim, and **GRANTED IN PART** as to Count I of the Counterclaim insofar as Defendants seek a declaratory judgment that the purchase price adjustment entitles Defendants to $48,276, and **DENIED** as to Count II of the Amended Complaint and Counts II and III of the Counterclaim, and **DENIED IN PART** as to Count I of the Counterclaim insofar as Defendants seek a declaratory judgment that the purchase price was overstated in the amount of $86,341.59.

The claims remaining to be adjudicated are (1) Plaintiffs' claim to enforce the oral agreement (Count II of the Amended Complaint), (2) Defendants' claim for rescission of the oral agreement (Count II of the Counterclaim), (3) Defendants' claim for Declaratory Judgment that the purchase price was overstated in the amount of $86,341.59 (Count I of the Counterclaim), and (4) Defendants' claim for reformation of the Note to reduce the amount owed thereunder by $86,341.59 plus interest (Count III of the Counterclaim).

It is **FURTHER ORDERED** that Defendants' Motion for Oral Argument (Docket Item No. 56) be, and it is hereby, **DENIED**.

/s/Gene Carter_____
**GENE CARTER**
Senior United States District Judge

Dated at Portland, Maine this 16th day of May, 2006.